IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH PATRICK GUERRIERO, | : | 4:16-CV-00740 |
| | : | |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| v. | : | |
| | : | |
| LOCK HAVEN UNIVERSITY | : | |
| OF PENNSYLVANIA and | : | |
| PENNSYLVANIA STATE SYSTEM | : | |
| OF HIGHER EDUCATION, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

MAY 4, 2017

## I. BACKGROUND

Pending before the undersigned is Plaintiff, Joseph Patrick Guerriero's, third

action in this venire against his employer, Defendants Lock Haven University of

Pennsylvania and the Pennsylvania State System of Higher Education. The instant

matter is a one-count complaint, which alleges retaliation in violation of both Title

VII of the Federal Civil Rights Act of 1964[1] and the Pennsylvania Human

Relations Act.[2] Defendants have moved to dismiss the action. For all of the

foregoing reasons the motion will be granted. However, Plaintiff will be provided

---

[1] Hereinafter "Title VII"

[2] Hereinafter "PHRA"

1

leave to amend pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a

motion to dismiss for "failure to state a claim upon which relief can be granted."

Such a motion "tests the legal sufficiency of a pleading" and "streamlines litigation

by dispensing with needless discovery and factfinding."[3] "Rule 12(b)(6)

authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[4]

This is true of any claim, "without regard to whether it is based on an outlandish

legal theory or on a close but ultimately unavailing one."[5]

Beginning in 2007, the Supreme Court of the United States initiated what

some scholars have termed the Roberts Court's "civil procedure revival" by

significantly tightening the standard that district courts must apply to 12(b)(6)

motions.[6] In two landmark decisions, *Bell Atlantic Corporation v. Twombly* and

*Ashcroft v. Iqbal*, the Roberts Court "changed . . . the pleading landscape" by

---

[3] *In re Hydrogen Peroxide Litigation*, 552 F.3d 305, 316 n.15 (3d Cir. 2008) (Scirica, C.J.) (*quoting Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)). *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

[4] *Neitzke*, 490 U.S. at 326 (*citing Hishon v. King & Spalding*, 467 U. S. 69, 73 (1984)).

[5] *Neitzke*, 490 U.S. at 327.

[6] Howard M. Wasserman, THE ROBERTS COURT AND THE CIVIL PROCEDURE REVIVAL, 31 Rev. Litig. 313 (2012).

"signal[ing] to lower-court judges that the stricter approach some had been taking was appropriate under the Federal Rules."[7]  More specifically, the Court in these two decisions "retired" the lenient "no-set-of-facts test" set forth in Conley v. Gibson and replaced it with a more exacting "plausibility" standard.[8]

Accordingly, after Twombly and Iqbal, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[9]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10]  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[11]  Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[12]

---

[7]  550 U.S. 544 (2007); 556 U.S. 662, 678 (2009), *Wasserman, supra* at 319-20.

[8]  *Iqbal*, 556 U.S. at 670 (*citing Conley v. Gibson*, 355 U.S. 41 (1957)) ("[a]cknowledging that Twombly retired the Conley no-set-of-facts test").

[9]  *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570).

[10]*Iqbal,* 556 U.S. at 678.

[11]  *Connelly v. Lane Const. Corp.*, No. 14-3792, 2016 WL 106159, at *3 (3d Cir. Jan. 11, 2016) (Jordan, J.) (internal quotations and citations omitted).

[12]  *Twombly*, 550 U.S. at 556.

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[13] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[14]

When disposing of a motion to dismiss, a court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."[15] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[16] "After Iqbal, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss."[17] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[18]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

---

[13] *Iqbal*, 556 U.S. at 679.

[14] *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557 (internal quotations omitted)).

[15] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[16] *Iqbal*, 556 U.S. at 678 (internal citations omitted).

[17] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.).

[18] *Iqbal*, 556 U.S. at 678.

Under the pleading regime established by Twombly and Iqbal, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[19]

I turn now to the Plaintiff's factual allegations, which I must accept as true on a Rule 12(b)(6) motion.

B.      FACTS ALLEGED IN THE COMPLAINT

Plaintiff, Joseph Patrick Guerriero, hereinafter "Guerriero," has been employed by Defendants Lock Haven University of Pennsylvania and the Pennsylvania State System of Higher Education, hereinafter, collectively, "LHU," since 1998.   Guerriero first filed a complaint against LHU in 2003, pursuant to the retaliation provisions of both Title VII and the PHRA.  This action was settled by the parties, and subsequently dismissed in accordance with the settlement agreement in 2006.

In 2008, Guerriero filed a second action against LHU.  The 2008 action was, again, premised as a claim of retaliation in violation of Title VII and the PHRA.  It also proceeded as a breach of contract action for breach of the 2006 settlement agreement.  On November 10, 2009, following a jury trial, a verdict of sixty-

---

[19]  *Connelly*, 2016 WL 106159, at *4 (internal quotations and citations omitted).

thousand dollars ($60,000) was returned in favor of Guerriero.

The following paragraphs from the complaint comprise Guerriero's factual assertions.

¶ 13). In or around September of 2011, Defendants hired a new President, Michael Fiorentino. In an attempt to assist Mr. Fiorentino in his new position, Plaintiff sent an email offering his expertise and willingness to return to Defendants' athletics department.

¶ 14). Despite never having met Plaintiff and regardless of Plaintiff's extensive and laudatory career in athletics, Mr. Fiorentino responded dismissively of Plaintiff's offer stating that, after speaking to former Presidents, as well as the Chancellor, Mr. Fiorentino had no intention of assisting Plaintiff in any fashion in working in Athletics.

¶ 15). Nearly a month later in October of 2011, Defendants made unfounded allegations that Plaintiff had improperly provided benefits to a student-athlete in an attempt to harm Plaintiff's standing within his profession and to ensure that Plaintiff would not work within Athletics.

¶ 16). As a result of the allegations, Defendants forbade Plaintiff's professional interaction with student-athletes, as well as compelled Plaintiff to undergo training for supposed violations of NCAA rules and regulations.

¶ 17). Despite the aforementioned supposed violations, Plaintiff never received an admonishment, never received sanctions, and never received punishment of any kind on behalf of the NCAA.

¶ 18). The allegations were baseless and motivated by Defendants to marginalize Plaintiff's interaction within athletics, decrease his standing within his own profession and/or Athletics, and subject Plaintiff to unfounded criticism and shame.

¶ 19). Four months later, in or around February of 2012, Defendant removed then-Athletic Director Sharon Taylor from her capacity as Athletic Director.

¶ 20). Despite Plaintiff's extensive career in athletics, his previous and considerable experience as Assistant Athletic Director for Defendants, and Plaintiff's credentials being comparable to the eventual hires for Interim AD and Assistant AD, Defendants never offered Plaintiff the chance to interview nor was Plaintiff given any consideration for either position.

¶ 21). In a meeting a month later with Carl Poff and Dave Bower, Interim AD and Assistant AD, respectively, both informed Plaintiff that he was to "tread lightly" and that there were "others in the department" who "did not like him because of his previous suits."

¶ 22). In the Spring of 2013, Defendants announced the position of "Summer Camps" director.

¶ 23). Once again, despite Plaintiff's past experience directing multiple camps and clinics on behalf of Defendants and other institutions, as well as his work as Assistant Athletic Director, Plaintiff was not spoken to nor granted an interview for the position of "Summer Camps" director despite him expressing his interest in the position.

¶ 24). Defendants' decision to not interview nor even consider Plaintiff for the position of Summer Camps director, despite his qualifications and past experience in this very field, was retaliatory conduct motivated primarily by their anger at Plaintiff for filing previous lawsuits against Defendants.

¶ 25). In the Fall of 2013, Plaintiff approached the then recently appointed Athletic Director, Mark Sherburne, offering to work on various projects within Athletics, even on a voluntary basis.

¶ 26). However, similarly to the response received from Mr. Fiorentino previously, Mr. Sherburne, despite never worked alongside Plaintiff, replied that Plaintiff was prohibited from working within Athletics, even on a voluntary basis.

¶ 27). Defendants were fully aware of Plaintiff's desire, experience, and wish to work in Athletics and continually refused to offer a position within athletics, even by way of a perk to Plaintiff on a voluntary basis. Defendants' motivation in not permitting Plaintiff to work within Athletics was primarily motivated by and in retaliation of their anger at Plaintiff for filing previous lawsuits against Defendants.

¶ 28). Next, in January of 2014, Plaintiff requested a meeting with Defendants' recently appointed Vice President of University Relations, Mr. Rodney Jenkins, to both introduce himself and express his continued interest in working in Athletics.

¶ 29). At the aforementioned meeting, Mr. Jenkins asked Plaintiff why, despite his continued interest and his experience, he wasn't currently working in Athletics. After Plaintiff recounted the previous suits and history between the parties, Mr. Jenkins replied that "[Plaintiff] must've pissed someone off" and that Mr. Jenkins would speak to the President and others about "getting [Plaintiff] back into athletics where your strengths and passions can be maximized".

¶ 30). Two weeks later, Mr. Jenkins wrote an email to Plaintiff advising him that Plaintiff would not be permitted to work in Athletics.

¶ 31). Subsequent to the aforementioned email, Mr. Jenkins approached Plaintiff at a YMCA fundraiser and communicated to Plaintiff that "[Jenkins] wished that [Jenkins] could tell some of the things that [Defendant] were doing to [Plaintiff]."

¶ 32). Defendant's refusal to permit Plaintiff to work in Athletics, along with statements made by Defendant's own Vice President of University Relations, Mr. Jenkins. clearly show that said actions were retaliatory in nature and primarily motivated by Defendants' anger at Plaintiff for filing previously lawsuits against Defendants.

¶ 33). Further, in the Fall of 2014, Plaintiff again reached out to the new Dean, Mr. Steve Neun. Plaintiff had sent his resume and credentials prior to a meeting with Mr. Neun.

¶ 34). Mr. Neun, despite specifically referring to Plaintiff's resume as "impressive" and indicative of a "renaissance man", advised Plaintiff that, after speaking with others in the administration, there was no way that Plaintiff would resume working in Athletics.

¶ 35). In the Spring of 2015, Defendants' Clearfield branch campus celebrated their 25th Anniversary.

¶ 36). Despite being the founding Director and CEO of the Clearfield branch campus and remaining in such a capacity for seven years, Plaintiff was not invited to the 25th Anniversary.

¶ 37). Defendants' primary motivation for not inviting Plaintiff to the 25th Anniversary of Lock Haven University Clearfield was due to anger and in retaliation of Plaintiff's previous suits in a further attempt to subject Plaintiff to unfounded criticism and shame.

¶ 38). Finally, later that Summer, Defendants' Athletic Director resigned and a search was initiated to find a successor.

¶ 39). Based on Plaintiff's extensive experience in athletics, his proficiency as a fundraiser for Defendants, and his previous position as Assistant Athletic Director on behalf of Defendants, Plaintiff submitted his application for Defendants' opening Athletic Director position.

¶ 40). Prior to submitting his application, Plaintiff spoke to Women's Head Soccer Coach and a member of the search committee for the Athletic Director's position, Rob Eaton.

¶ 41). While communicating to Plaintiff that, going forward, he could not speak to any prospective applicants, Mr. Eaton did inform Plaintiff that, based on his resume and previous experience, he thought Plaintiff would

be a "leading candidate".

¶ 42). On July 4, 2015, Plaintiff received an email from Defendants stating that Plaintiff was no longer being considered for the position of Athletic Director.

¶ 43). Plaintiff then emailed Mr. Eaton and asked how a supposed "leading candidate" could not even receive an interview for the position.

¶ 44). After Mr. Eaton requested Plaintiff's cell number via email, Mr. Eaton communicated to Plaintiff that "[Plaintiff] would be shocked at what [Defendants] are doing to [Plaintiff] in this search" and that Eaton further told the committee that Eaton felt the committee was "breaking laws and that the search should be failed immediately". Mr. Eaton further communicated to Plaintiff his intent to go to the Vice President of University Relations, Mr. Jenkins, and demand that the search be failed.

¶ 45). Nearly a month later, in a conversation at Clinton Country Club, Mr. Eaton advised Plaintiff that he advised Mr. Jenkins to fail the search but that Mr. Jenkins declined and informed Mr. Eaton that the search would go on as planned.

¶ 46). Despite Plaintiff's extensive qualifications and prior work history, Plaintiff was never considered, let alone interviewed, for the position of

Athletic Director.

¶ 47). Defendants' decision to not interview Plaintiff, nor even consider Plaintiff, for the position of Athletic Director despite his qualifications and prior experience, was primarily motivated by Defendants' anger and in retaliation of Plaintiff filing previous lawsuits against Defendant.

¶ 48). The Defendant's aforementioned actions, including Defendant's refusal to consider nor interview Plaintiff for the position of "Summer Camps" Director, Defendant's refusal to consider nor interview Plaintiff for the position of Interim or Assistant Athletic Director, and Defendant's refusal to consider nor interview Plaintiff for the position of Athletic Director, were primarily motivated by and in retaliation of Plaintiff previously filing two Federal lawsuits.

¶ 49). Additionally, Defendant's refusal to allow Plaintiff the opportunity, even including work on a voluntary basis, for various positions in Athletics, as well as Defendant's petty refusal to invite Plaintiff to a 25th Anniversary celebration of Lock Haven University Clearfield Branch Campus, were primarily motivated and in retaliation of Plaintiff previously filing two Federal lawsuits.

¶ 50). Further, Defendant's malicious and intentional allegations of Plaintiff's supposed violation of NCAA rules and regulations - causing Plaintiff to be removed from any professional interaction with student-athletes and having to undergo training for a violation that was never based on merit – were primarily motivated by and in retaliation of Plaintiff previously filing two Federal lawsuits.

¶ 51). In addition, Defendants engaged in retaliatory conduct in the form of attempting to preclude or limit, and precluding and limiting, Plaintiff's desire to work in Athletics; subjecting Plaintiff to undergo training that other similarly situated individuals were not obligated to undertake; attempting to preclude and limit, and precluding and limiting, career advancement promotions that other similarly situated individuals were not such limited; and, subjected Plaintiff to unfounded criticism, speculation, gossip, and malicious allegations that other similarly situated individuals were not subjected to.

¶ 52). Similarly situated individuals and employees who have neither filed previous lawsuits versus Defendants nor filed previous grievances have been subjected to the aforementioned retaliatory conduct.

¶ 53). Plaintiff has repeatedly and consistently reported and opposed the aforementioned retaliatory conduct to his employers.

¶ 54). Defendants have repeatedly and consistently failed and refused to take reasonably appropriate steps to remedy the aforementioned retaliatory conduct.

¶ 55). In all the aforementioned retaliatory conduct, a substantial motivating or determinative factor of Defendants' retaliatory conduct against Plaintiff, as well as Defendants' prohibition of any opportunity of Plaintiff to have a role within Athletics, was due to Plaintiff's filing of previous grievances and/or lawsuits against Defendants.

C.   ANALYSIS

Section 704(a) of Title VII states:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.[20]

---

[20]  42 U.S.C. § 2000e-3(a).

The elements of retaliation are the same for both Plaintiff's Title VII and

PHRA claims.[21]  The elements are "(1) plaintiff engaged in conduct protected by

Title VII; (2) the employer took adverse action against plaintiff; and (3) a causal

link exists between plaintiff's protected conduct and the employer's adverse

action."[22]  Explaining the first element, the Honorable Samuel A. Alito writing for

United States Supreme Court stated,  "Title VII's antiretaliation provision forbids

employer actions that 'discriminate against' an employee (or job applicant)

because he has 'opposed' a practice that Title VII forbids or has 'made a charge,

testified, assisted, or participated in' a Title VII 'investigation, proceeding, or

hearing.'[23]

For purposes of the instant motion, LHU concedes that Plaintiff has stated a

claim satisfying the first two elements.  Defendants argues that Plaintiff has not

stated a claim for the third element, the causal link. LHU argues that because

Plaintiff's claim lack a temporal proximity between the conduct and alleged

---

[21]  "Claims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson v. Lafayette College*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006) (*citing Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).  Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly,* 94 F.3d at 105.  "Moreover, the PHRA definition of "handicap or disability" is substantially similar to the definition of "disability" under the ADA." *Id.*

[22]  *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.1994).

[23]  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59, 126 S. Ct. 2405, 2410, 165 L. Ed. 2d 345 (2006) *citing* Title VII at 42 U.S.C. § 2000e-3(a).

retaliation, there can be no inference of retaliation spanning 2011 to 2016, from federal lawsuits filed by Guerriero against LHU in 2003 and 2008.

A plaintiff may establish the requisite causal connection between a protected activity and an adverse employment action through either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[24]  Alternatively, in the absence of such evidence, the plaintiff can satisfy this element if "from the 'evidence gleaned from the record as a whole,' " a trier of fact can infer causation.[25]   The Third Circuit has cautioned diligence in making this causal determination because "otherwise a public actor cognizant of the possibility that litigation might be filed against him . . . could be chilled from taking action that he deemed appropriate and, in fact, was appropriate."[26]

That said, "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' . . ."[27]   The Third Circuit has found

---

[24] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[25] *Id.* (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000)).

[26] *Id.*

[27] *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).

that a lapse of three or four months is insufficient to establish unusually suggestive temporal proximity.[28]  In point of fact, "'although there is no bright line rule,' the Third Circuit has not found any period longer than three weeks so 'unduly suggestive' of retaliatory animus that it was sufficient to establish causation without other evidence."[29]

The action that Guerriero brought in 2008, reached verdict in 2009, and the last, of several, post-trial motions was finalized on May 9, 2011.  Consequently, there may been temporal proximity based on the allegations in his complaint that begin in 2011.  However, neither party made agreements as to precise dates that the Court should utilize to determine temporal proximity.  Defendants' laconic brief merely argues that Plaintiff generally hasn't shown a temporal proximity between his "prior lawsuits" and the actions he alleges commencing in 2011.

Despite the absence of comprehensive argument, the analysis as to the temporal proximity must wait until another day as the Court must reconcile two interrelated issues that I now  raise *sua sponte*.  First, Plaintiff has not attached a right to sue letter to his complaint, nor did he aver in his complaint that one has

---

[28]  *Id.* (*citing Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997), *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)); *see also LeBoon v. Lancaster Jewish Cmty. Center Ass'n*, 503 F.3d 217, 234 (3d Cir. 2007) (holding that a period of three months between the protected activity and the adverse employment action was insufficient).

[29]  *Cary v. National Events Svcs.,* 2015 WL 667519, *7 (E.D. Pa. Feb. 13, 2015) (*citing Thomas v. Town of Hammonton,* 351 F.3d 108, 114 (3d Cir. 2003)).

been issued to him. "A complainant may not bring a Title VII suit without having first received a right-to-sue letter."[30] Second, without the date of the right to sue letter, this Court has no method of determining whether this action was timely filed, as an action under Title VII must be brought within ninety days pursuant to the statute.[31]

Furthermore, the PHRA maintains the same requirement as Title VII that a Plaintiff must first proceed administratively. The PHRA's procedural requirements, laid out in § 959, require that:

> Any person claiming to be aggrieved by an alleged unlawful discriminatory practice may make, sign and file with the Commission a verified complaint, in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the Commission.[32]

It is well-established that "the purpose of requiring an aggrieved party to resort first to the EEOC is twofold: to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation."[33] The PHRA's procedural exhaustion requirements are also jurisdictional, meaning that "[a

---

[30] *Burgh v. Borough Council of Borough of Montrose,* 251 F.3d 465, 470 (3d Cir. 2001)

[31] 42 U.S.C.A. § 2000e-5.

[32] 43 Pa. Stat. Ann. § 959.

[33] *Glus v. G. C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977).

PHRA] action ordinarily may be brought only against a party previously named in an EEOC action."[34]

In accordance with these procedural requirements, I will provide Plaintiff with the opportunity to amend his complaint to establish these jurisdictional prerequisites.

## III.  CONCLUSION

Having concluded that there are deficiencies in Plaintiff's complaint in several respects, I will grant the Defendants' motion to dismiss and provide Plaintiff an opportunity to amend his complaint.

An appropriate Order follows.

BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

---

[34] *Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh, Pa.*, 903 F.2d 243, 252 (3d Cir. 1990)